IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CAROLINE CALLAWAY, | § | |
|     PLAINTIFF, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 1:15-cv-00103-SS |
| | § | |
| CITY OF AUSTIN; TRAVIS COUNTY; | § | |
| AUSTIN POLICE OFFICER PATRICK | § | |
| OBORSKI; AUSTIN POLICE OFFICER | § | |
| ADAM JOHNSON, | § | |
|     DEFENDANTS. | § | |

**DEFENDANT TRAVIS COUNTY'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE SAM SPARKS:

Pursuant to Federal Rule of Civil Procedure 56, Defendant Travis County moves for summary judgment in its favor, and asks the Court to dismiss Plaintiff Caroline Callaway's ("Callaway") claims against Travis County in their entirety. In support of this Motion, Defendant Travis County offers the following:

**I. EVIDENCE**

The following exhibits are attached to this motion and are incorporated by reference as if fully set out herein:

    Ex 1    Travis County booking photos of Caroline Callaway;
    Ex 2    APD Reports of 3/4/10 and 12/9/11;
    Ex 3    Deposition Transcript Part 1 Excerpts of Caroline Callaway taken Nov. 23, 2015;
    Ex 4    APD Report of Incident w/mother on February 6, 2013;
    Ex 5    Affidavit for Warrant of Arrest and Detention;
    Ex 6    APD Transcript of Arrest Video;
    Ex 7    Deposition Transcript Part II Excerpts of Caroline Callaway taken Feb. 26, 2016;
    Ex 8    Criminal Trial Transcript Testimony Excerpts of Caroline Callaway;
    Ex 9    Deposition Transcript Excerpts of Callaway's Expert George L. Kirkham taken Jan. 15, 2016;
    Ex 10  Criminal Trial Transcript Testimony Excerpt of Efrain Perez, APD Crime Lab Forensic Scientist;
    Ex 11  Kirkham Expert Report dated September 2, 2015;

    Ex 12  Criminal Trial Transcript Testimony Excerpts of APD Officer Oborski;
    Ex 13  Affidavit of Lieutenant Jennifer Gould;
    Ex 14  Raul Banasco Expert Report dated October 5, 2015;
    Ex 15  Report of Captain Nelda Pena;
    Ex 16  Time Stamped Photo of Callaway taken February 6, 2013;
    Ex 17  Photo capture of Callaway's neck taken at Deposition Part II; and
    Ex 18  Callaway booking photo with hand drawn arrow comparison.

## II. STANDARD OF REVIEW

1.    Upon motion and after an adequate time for discovery, FRCP 56(c), "mandates the entry of summary judgment against any party who fails to makes a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 447 U.S. 317 -318 (1986). Summary judgement is proper when there is "no genuine issue as to any material fact since a failure of on an essential element of the nonmoving party's case causes all other facts to be immaterial." *Id.* (internal citations and quotations omitted). Thus, since "the nonmoving party has failed to make a sufficient showing regarding an essential element of its case with respect to which it has the burden of proof," the movant "is entitled to judgment as a matter of law." *Id.* (internal citations and quotations omitted).

## III. PROCEDURAL BACKGROUND

2.    Callaway's Original Complaint, filed on the date the statute of limitations ran, named the City of Austin, Travis County, Austin Police Officers Adam Johnson and Patrick Oborski, Pro Touch Nurses, Inc. and Shanea Ramsey-Graham and Travis County employees, John Doe G-H. **[Dkt. 1]**. Callaway then amended her complaint twice and attempted to sue certain Travis County employees individually based upon her "John Doe" placeholders. **[Dkts. 10 and 35]**. All Defendants filed motions to dismiss, which were granted in part and denied in part. The Court's Order on Pending Motions to Dismiss, **[Dkt. 59]**, dismissed all claim**s** but for the following: *Monell* claims against Travis County and the City; and § 1983 claims against the two Austin Police

Department Officers, including a bystander claim against these two APD officers. This Motion, Defendant Travis County's Motion for Summary Judgment, seeks to dismiss the only remaining claim against Travis County: that a custom, policy or practice of Travis County's was the moving force behind Callaway's alleged constitutional violations. *Pietrowski v. City of Houston*, 237 F. 3d 567, 579 (5th Cir. 2001). *Monell v. Dep't of Social Services*, 436 U.S. 658, 694, (1978).

## IV.  FACTUAL BACKGROUND

3.  In accordance with *Graham v. Connor*, 490 U.S. 386, 396 (1989), requiring the examination of the "facts and circumstances of each particular case" Travis County offers the following facts:

4.  Before the incident that forms the basis of this lawsuit, Caroline Callaway was a UT student with a history of assaultive behavior and DWI. (**Ex 1 - Travis County booking photos of Caroline Callaway**). By the time she was twenty-two, Callaway had been jailed by Travis County three times; the first time for assault family violence, the second time for a DWI so severe that she rolled her father's car and remembers nothing of it. (**Ex 2 – APD Reports of 3/4/10 and 12/9/11; Ex 3 - Callaway Deposition Part I, p. 11, line 12 thru p. 18, line 3**). The third time, is the case at bar. *Id.* The day after the events in this lawsuit, Callaway's mother called APD because Callaway attacked her. (**Ex 4 - APD Report of Incident w/mother on February 6, 2013**). Despite the unsupported picture painted by Callaway's expert, of a UT co-ed so frightened and harmless and shocked by the central booking process that she posed zero threat; the irrefutable evidence shows that Callaway had both assaultive tendencies and previous experience in Travis County's Central Booking.

5.  In the early morning hours of Monday February 8, 2013, Callaway ran two red lights while on her way home from a party. (**Ex 5 - Affidavit for Warrant of Arrest and Detention**). At

12th and Lamar Blvd., Callaway was detained by Co-Defendant APD Officer Patrick Oborski. *Id*. It was a Super Bowl "no refusal" weekend. (**Ex 6 - APD Video Transcript of Arrest, p. 18, lines. 14-15**). Although she had consumed alcohol earlier in the evening, Callaway denied that she had been drinking. (**Ex 6 - APD Video Transcript of Arrest, p. 3 ln. 23 - p. 4 ln. 6; and Ex 5 - Affidavit for Warrant of Arrest and Detention; Ex 3 - Callaway Deposition part I, p. 22, lines 15-16**). Officer Oborksi conducted a field sobriety test, was not satisfied with Callaway's performance, and requested that she submit to a breathalyzer. Callaway refused. (**Ex 6 - APD Video Transcript of Arrest, p. 14 lns. 20-25; p.15 lns. 3-24**). Officer Oborski attempted to negotiate with her and to de-escalate the situation by saying she had "one chance to stay out of jail tonight." (**Ex 6 - APD Video Transcript of Arrest, p. 18 line 10- thru p. 19, line 9**). She continued to refuse. *Id*. Officer Oborski told her that he would get a warrant for a blood draw. (**Ex 6 - APD Video Transcript of Arrest, p. 23 ln. 21 - p. 25 lns. 16**). In response, Callaway challenged Officer Oborski stating, "Good luck taking my fucking blood!" (**Ex 6 - APD Video Transcript of Arrest, p. 26 lns. 5-13**). She also asserted that she was deaf (although she is not actually deaf) and could not hear the officer. (**Ex 6 - APD Video Transcript of Arrest. p. 22, line 17 - p. 23, line 2; Ex 7 - Callaway Deposition Part II, p. 239, line 24 – p. 240 line 3).** Officer Oborski arrested Callaway, transported her to Travis County Central Booking, and after one additional plea to Callaway for her cooperation with the blood draw, (**Ex 7 - Callaway Deposition Part II, p. 241, lines. 4-10**) obtained a warrant from a magistrate for a blood draw. (**Ex 5 - Affidavit for Warrant of Arrest and Detention**).

      6.      Over an hour after her arrest (**Ex 9 - Deposition Transcript of George L. Kirkham, p. 104 lns. 17-19**), Callaway was escorted into the blood draw room where a phlebotomist, who was under contract with APD, asked Callaway to consent to a blood draw. (**Ex 8**

- **Criminal Trial Testimony of Caroline Callaway, p. 32 lns. 17-23; Ex 15 – Report of Capt. Nelda Pena, paragraph 7**). Callaway continued to refuse. *Id.* Because of her continued noncompliance and the immediate need to obtain blood alcohol evidence before it dissipated, APD requested Travis County's assistance and correctional officers placed her in a restraint chair in order to fulfill the terms of the court order for a blood draw. **[DKT 35, ¶ 14].** (**Ex 12 - Criminal Trial Transcript Testimony of APD Officer Oborski, p. 51, lines. 12-16**). Travis County does not perform the blood draw, but if it is necessary to restrain an arrestee for the blood draw, Travis County officers will assist. (**Ex 15 – Report of Capt. Nelda Pena, paragraph 7**). Once in the restraint chair, Callaway continued to adamantly physically resist by violently thrashing her body against the straps. (**Ex 5 - Affidavit for Warrant of Arrest and Detention**). By her own admission, Callaway was "freaking out." (**Ex 7 - Callaway Deposition Part II, p. 247, lines 4-9; Ex 8 - Callaway Criminal Trial Testimony p. 38, lines 24, p. 39, line 8**). Her actions caused the phlebotomist's needle to pop out of her arm and blood to spurt on an APD officer. (**Ex 9 - Deposition Transcript of George L. Kirkham, p. 33 lns. 7-22**). Although the probable cause affidavit indicates Travis County officers used pressure points to gain compliance (**Ex 5 -Affidavit for Warrant of Arrest and Detention**), Callaway's expert feels a chokehold may have been applied. (**Ex 9 - Deposition Transcript of George L. Kirkham, p. 213 ln. 11 -20**). Within 30 to 40 minutes, Callaway was out of the restraint chair and released to holding shortly thereafter. (**Ex 8 - Criminal Trial Transcript of Caroline Callaway, p. 40 lns.10-11; Ex. 5**). It is undisputed that Callaway requested no medical attention during her booking and detention. (**Ex 9 - Deposition Transcript of George L. Kirkham p. 149, lns. 15-22; p. 217, ln. 25 – p. 218, line 5**). It is further undisputed that no injuries were noted in Callaway's jail booking records, other than some redness on her wrists, and no complaint/report was made to Travis County or City of Austin regarding the

alleged incident and injuries prior to filing suit. (**Ex 7 - Callaway Deposition Part II, p. 264, line 12-18; Ex 9 - Deposition Transcript of George L. Kirkham p. 217, ln. 25 – p. 218, line 5**). Callaway's booking photo shows no injury to her neck. (**Ex 1 – Callaway booking photo page 2, date capture 20130204**).

7. Callaway was charged with DWI, possession of marijuana and resisting a search. (**Ex 5 - Affidavit for Warrant of Arrest and Detention**). While APD found Callaway's blood alcohol to be twice the legal limit, a Travis County jury found her not guilty. (**Ex 10 - Criminal Trial Transcript of Efrain Perez, p. 22 lns 22-23**). On the day the statute of limitations ran on this claim, Callaway filed suit. **[DKT. 1]**. Callaway offers three facts to support her claim against Travis County: (1) the use of the restraint chair to draw blood under a warrant after an arrestee has verbally refused to provide a sample at least seven times; (2) the use of the spit hood mask for twenty seconds during the blood draw; (3) the alleged use of a chokehold. **[See DKT 35 Callaway's Second Amended Complaint and evidence supporting this Motion,** *infra.***]**.

## V. ARGUMENT

### A. *Elements of a Monell Claim against Travis County*

8. In order to establish municipal liability against Travis County, a plaintiff must prove: (1) a policymaker; (2) a custom, policy or practice; and (3) a violation of a constitutional right whose "moving force" is the custom, policy or practice. *Pietrowski v. City of Houston,* 237 F. 3d 567, 578 (5th 2001) citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 694, (1978). Of Callaway's three claims against Travis County, the first two, use of the restraint chair and the use of the spit hood mask, were objectively reasonable under the facts of this case. The third allegations, chokehold, will be submitted to an analysis under the *Monell* factors. See discussion, *infra.*

**B.** *Standard is Objective Reasonableness*

9.      In this case, the Court has explained that Callaway is not asserting a Fourth Amendment claim as to the reasonableness of her arrest, the reasonableness of the warrant nor the constitutional validity of a blood draw under warrant. **[DKT 59 at 7].** As the Court states: "her complaint centers on the allegedly unreasonable manner in which the blood draw was carried out." *Id*. Further, the Court explains that whether her claim is couched as excessive force or unreasonable search and seizure, these terms describe the same concern: Defendants' use of force in carrying out the blood draw was excessive. *Id*. The Court then instructs the parties to analyze Callaway's claims under the "excessive force" factors set forth in *Graham v. Connor*, 490 U.S. 386, 394-95 and reiterated in *Kingsley vs. Hendrickson*, 2015 U.S. Lexis 4073, *12-13; 135 S. Ct. 2466 (2015). **[DKT 7]**.

10.     In *Kingsely*, the Supreme Court explains that the correct standard for use of force against an individual detained in a jail is "objective reasonableness" turning on the "facts and circumstances of each particular case." *Id.* quoting *Graham v. Connor*, 490 U.S. 396. The Supreme Court also points out that a court must "account for the legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in th[e] judgement of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Kingsely* at 2473 (internal citations and quotations omitted). Regarding the factors of internal order and security, when officials have a warrant for a blood draw obtaining the sample is time sensitive because the blood alcohol level is degrading. (**Ex 12 - Criminal Trial Transcript Testimony of APD Officer Oborski, p. 51 line 4- 52 line 14**). Additionally, jail officials must maintain a calm environment in Central Booking, which includes a restraint-free open area with seating, a TV and restroom, and

avoid outburst by arrestees that could lead to general unrest among the inmates.  (**Ex. 13 – Affidavit of Lt. Jennifer Gould paragraph 14; Ex 15 – Report of Capt. Nelda Pena, paragraphs 4-5**).

**C.** *Use of Restraint Chair was Objectively Reasonable and Means of Last Resort*

11. Callaway complains that she was placed in the restraint chair.  **(DKT 35 paragraphs 13-14**).  Travis County's use of the restraint chair was objectively reasonable when that chair was used so that APD could obtain a sample of Callaway's blood under a warrant.  By Callaway's own account, Officials asked Callaway to consent to having her breath sampled or blood drawn seven (7) times and each time she refused, either flatly refused or with colorful language like "good luck getting my fucking blood" or by telling the officer that she was deaf, which she is not, and could not hear his orders.  (**Ex 7 - Callaway Deposition Part II, p. 238 line 16 - 245 line 24**).  Additionally, the transcript from the arrest video shows Officer Oborski attempting to negotiate with Callaway and to de-escalate the situation, "I'm giving you one chance to stay out of jail tonight right now, okay?"  (**Ex 6 - APD Video Transcript of Arrest, p. 18, lines. 10-11**).  He also explained the warrant process related to blood draw to her in detail and still she refused to comply.  (**Ex 6 – APD Video Transcript of Arrest p. 23, line 21 – p. 26, line 6**).

12. After transporting her to the jail, but before obtaining the warrant, Officer Oborski asked her again if she would consent to a blood draw, but Callaway continued to refuse.  (**Ex 7 - Callaway Deposition Part II, p. 241, lines 4-10**).  After Oborski obtained the warrant, the phlebotomist asked Callaway to consent to the blood draw.  (**Ex 7 - Callaway Deposition Part II, p. 243, lines 12-19**).  Again Callaway refused.  Thus, by the time Callaway was placed in the restraint chair, verbal negotiations and commands had been exhausted.  In fact, Callaway's own expert's only suggestion regarding avoiding the restraint chair was to have one final conversation

with her, but he admitted that, in his view, this was **not** constitutionally required. (**Ex 9 - Deposition Transcript of George L. Kirkham, p. 269, lines 20-24**).

13. Callaway asserts that she did not want to cooperate because she had seen a billboard from a group called "Don't Blow Dot Com" advising her not to blow. (**Ex 7 - Callaway Deposition Part II, p. 239 lines 12-14**). Additionally, she had a previous DWI on December 9, 2011 and six months prior to the arrest that forms the basis of this suit, she had been unable to drive without a restriction on her license, thus, it could be surmised that she was very motivated to avoid a second DWI charge. (**Ex 7 - Callaway Deposition Part II, p. 286, lines 7-11**). Her own statement shows her strong willingness to resist when she said to Officer Oborksi, "Good luck getting my fucking blood." (**Ex 6 - APD Video Transcript of Arrest, p. 26, lines 1-13**). Given these facts, officials did not resort to immediate physical force without first attempting negotiation and commands. *Newman v. Guerdry*, 703 F. 3d 757, 763 (5th Cir. 2012). Callaway simply refused to comply.

14. When after numerous requests for compliance, a person continues to resist having a sample drawn, even after a warrant is in place, the restraint chair is an objectively reasonable and effective way to obtain the sample quickly and relatively safely. As Officer Oborski explained in the criminal trial:

> "Well, I mean a search warrant is to draw blood. The way they draw blood is to stick needles in the arm. When you're dealing with needles and blood and things like that, you want it to be as sanitary and safe as you can possibly be. So for that fact, we wanted her restrained because we knew at that point she was not willing to comply with the search warrant. We want to be able to keep her as still as we could and not just have blood go everywhere. That wasn't the idea. The idea was to take a specimen of blood as required by the search warrant and that is it."
>
> **Q.** "What concerns did you have about the defendant's own safety?"

**A.** "That she would have to be stuck multiple times in an attempt to serve the warrant. So the idea was to do the blood draw as easy as possible, take what was required by the warrant and move on."
(**Ex 12 - Criminal Trial Transcript Testimony of APD Officer Oborski, p. 55 lines 4-16**).

Also, the restraining of a person in the restraint chair is a means of last resort. By the time TCSO assists APD by placing an arrestee in the restraint chair for a blood draw, typically, the person has already refused the breathalyzer in the field, refused to give blood without a warrant at the jail and has refused to give blood with a warrant. (**Ex 13 - Affidavit of Lt. Jennifer Gould paragraphs 2-9**). For this reason, Travis County's practice of assisting APD with "blood draw search warrants" by placing noncooperative arrestees in the restraint chair is objectively reasonable and does not violate Callaway's Fourteenth Amendment rights.  Summary judgment should be granted on this issue.

D.  *<u>Spit Hood Mask was a reasonable manner of protecting Officers.</u>*

15. Callaway also complains about the use of the spit hood mask, but again, under the circumstances of this case, the use of the mask was objectively reasonable.  With regard to the spit hood mask, Callaway testified that once she was in the chair, they put the mask on her head and immediately, she felt pressure on her neck for five to eight seconds.  Then she let go and the pressure came off her neck. The mask remained on her head for an additional five to eight seconds, thus, for approximately 20 seconds Callaway had the spit hood mask on her head.  (**Ex 7 - Callaway Deposition Part II, p. 247 line 10 – page 249 line 15**). Captain Nelda Pena, a TCSO corrections captain with many years of experience in Central Booking states: "these masks are used to protect the phlebotomist and any other personnel present from being spat upon by individuals with unknown medical conditions which can pose a serious threat of physical harm to the involved correctional, law enforcement and medical staff.  These masks also protect the detainee from being

charged with a third degree felony for spitting on an officer." (**Ex 15 – Report of Capt. Nelda Pena, paragraph 9**). Also, as the Lieutenant over Central Booking explains when an arrestee is very agitated and in the chair with arms and legs strapped down, the only "weapon" the arrestee has is spitting or biting and the spit hood mask helps to prevent this. (**Ex 13 - Lt. Gould Affidavit paragraph 13**). According to Travis County's expert Raul Banasco, who is the jail administrator in Bexar County with 30 years' experience in corrections, use of the spit hood mask is standard practice when an arrestee is being combative. (**Ex 14 - Expert Raul Banasco Report pp. 4-5, paragraphs 2-4**). He also explains that the mask is comprised of thin material, like the masks worn by surgeons and will not result in the inmate being unable to breathe. *Id.* Callaway's expert, George Kirkham, attempts to create a fact issue on the spit hood mask by digressing on the use of hoods at Abu Ghraib and by the Gestapo, but these comparisons, where thick cloth or leather hoods were used for long periods of times as a means of torture, are inapposite. Callaway's expert, George Kirkham, also sites to study by the British Columbia police stating that spit hoods may be used "… where there is reasonable risk to the Members being spat upon." (**Ex 11 - Kirkham Expert Report, p. 3 paragraph 3**) which is exactly the concern cited by Travis County's Captain Pena. (**Ex 15 – Report of Capt. Nelda Pena, paragraph 9**). It is not objectively unreasonable to use a spit hood on an arrestee for a matter of seconds so that staff is not spat upon by an arrestee who is admittedly "freaking out." (**Ex 7 - Callaway Deposition Part II, p. 247 line 7**). For these reasons, summary judgment should be granted on the issue of the spit hood mask because its use by Travis County personnel was objectively reasonable.

**E.** *No custom policy or practice supports Chokehold Allegation*

16. Callaway's final allegation against Travis County is the alleged use of a chokehold. [**DKT 35 p. 5 paragraph 17**].

17. All individual county defendants were dismissed from this lawsuit with prejudice. **[DKT 59].** Thus, Travis County itself is the only remaining County Defendant and, as discussed below, Callaway cannot meet her high burden for establishing liability against the County.

18. There is no *respondeat superior* liability under § 1983. *Piotrowski v. City of Houston*, 237 F.3d at 578 citing *Monell v. Dep't of Social Services*, 436 U.S. at 694. Thus, in order to find liability against Travis County, Callaway must plead and prove: (1) a Travis County custom, policy or practice of using chokeholds under the circumstances present in the case at bar. *Piotrowksi* at 578. (2) There is a Travis County policymaker who could be held responsible through actual or constructive knowledge of creating the policy; (3) the policy was the moving force behind the constitutional violation. *Piotrowski c. City of Houston,* 237 F. 3d at 578. As the Fifth Circuit cautions, it is important to analyze each of these elements separately to distinguish between violations perpetrated by individual government employees and those perpetrated by the government itself. *Id*. The Fifth Circuit "demands a high standard of proof before imposing *Monell* liability on a municipality." *Snyder v. Trepagnier*, 142 F. 3d 791, 796 (5th 1998). The Fifth Circuit holds that the standard for municipal liability is "deliberate indifference" on the part of the municipality and for a municipality to be found liable, a plaintiff must offer evidence of more than just a decision, "but a decision by the [county] itself to violate the constitution." *Id*. *City of Canton v. Harris*, 489 U.S. 378, 395 (1989).

19. Typically, a single incident of unconstitutional activity will not impose liability under *Monell* unless proof of the incident includes: proof that it was caused by an existing unconstitutional municipal policy, which can be attributed to a municipal policymaker. But, as in the case at bar, where the policy relied upon is not itself unconstitutional "considerably more proof than a single incident will be necessary in every case to establish both the requisite fault on the part

of the municipality and the causal connection between the policy and the constitutional deprivation." *City of Oklahoma v. Tuttle*, 471 U.S. 808, 824 (1985).

20.     As Callaway's expert admitted, none of the Travis County witnesses condone the use of chokeholds nor does any Travis County policy. (**Ex 9 - Deposition Transcript of George L. Kirkham, p. 258, lines 15-21; p. 243, lines 11-18**). Captain Nelda Pena states that Travis County does not "allow the use of chokeholds as an authorized restraint technique" and based upon her experience of with the officers involved in Callaway's restraint, these officers were not likely to violate this policy. (**Ex 15 – Report of Capt. Nelda Pena, paragraph 8**). For these reasons, Callaway's *Monell* against Travis County related to choking should be dismissed and summary judgment granted.

21.     The only evidence that Callaway and her expert point to as evidence of a chokehold is a scrape that appears on her neck two days after the arrest (**Ex 16 - Time stamped photo of Callaway taken February 6, 2013**). The expert also notices marks down her throat. (**Ex 9 - Deposition Transcript of George L. Kirkham, p. 210 lines 9-20**). This evidence is weak at best. The same "mottled" pattern was apparent on Callaway at her deposition as a skin discoloration in February 2016. (**Ex 7 - Callaway Deposition Part II, p. 354 lines 5-11 and Ex 17 - Photo capture of Callaway's neck taken at Deposition Part II**). According to Travis County's Captain Nelda Pena, the scrape appears to be from a correctional officer attempting to apply a pressure point. (**Ex 15 – Report of Capt. Nelda Pena, paragraph 8**). Lieutenant Gould points out that when an arrestee is moving their head in the restraint chair while the officers are trying to use a hypoglossal pressure point, skin irritation can occur. (**Ex. 13 – Affidavit of Lt. Jennifer Gould, paragraphs 11-12**). Furthermore, APD's documentation shows that pressure points were applied to Callaway. (**Ex 5 - Affidavit for Warrant of Arrest**). Callaway's expert admitted that he too

would use pressure points in a case like this.  (**Ex 9 - Deposition Transcript of George L. Kirkham, p. 212, lines 10 thru p. 213, line 10**).  As previously discussed, jail nurses did not note any redness on her neck nor is any scrape apparent in her booking photo. (**Ex 18 – Callaway booking photo**).  On the booking photo attached as Ex 18 is a black ink arrow drawn by Callaway where she said the scrape later appeared even though it was not apparent in her booking photo.  (**Ex 7 – Callaway Deposition Part II, p. 353, lines 2-18**).  Lt. Gould attaches a chart of pressure points to her affidavit and states that Callaway's black ink arrow on her booking photo is consistent with the placement of a hypoglossal pressure point.  (**Ex. 13 – Affidavit of Lt. Jennifer Gould paragraphs 11-12**).  Thus, in the event Travis County's summary judgement is denied on the chokehold *Monell* claim, there is no credible evidence that a chokehold was in fact used.

## VI.  PRAYER

Defendant Travis County prays that all claims against it be dismissed with prejudice to refiling and prays for all other relief both at law and in equity to which it may be justly entitled.

Respectfully submitted,

DAVID ESCAMILLA
TRAVIS COUNTY ATTORNEY
P. O. Box 1748
Austin, Texas 78767
(512) 854-9415
FAX:  (512) 854-4808

By:     */s/ Laurie R. Eiserloh*
LAURIE R. EISERLOH
Assistant County Attorney
State Bar No. 06506270
laurie.eiserloh@traviscountytx.gov
ANTHONY J. NELSON
Assistant County Attorney
State Bar No. 14885800
tony.nelson@traviscountytx.gov
ATTORNEYS FOR DEFENDANT TRAVIS COUNTY

CERTIFICATE OF SERVICE

  I hereby certify that on the 25th day of March, 2016, I electronically filed the foregoing Defendant Travis County's Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

<u>*Via Email:*</u>
Daphne Pattison Silverman
SILVERMAN LAW GROUP
501 N. IH 35
Austin, Texas 78702

<u>*Via Email:*</u>
Broadus A. Spivey
Attorney at Law
3303 Northland Drive, Suite 205
Austin, Texas 78731
*Attorneys for Plaintiff, Caroline Callaway*

<u>*Via Email:*</u>
Chris Edwards
Assistant City Attorney
CITY OF AUSTIN-LAW DEPARTMENT
P.O. Box 1546
Austin, Texas 78767
*Attorneys for City of Austin Defendants*

             */s/ Laurie R. Eiserloh*
             Laurie R. Eiserloh
             Assistant County Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| CAROLINE CALLAWAY, § | |
| PLAINTIFF, § | |
| § | |
| Vs. § | CIVIL ACTION NO. 1:15-cv-00103-SS |
| § | |
| CITY OF AUSTIN; TRAVIS COUNTY; § | |
| AUSTIN POLICE OFFICER PATRICK § | |
| OBORSKI; AUSTIN POLICE OFFICER § | |
| ADAM JOHNSON, § | |
| DEFENDANTS. § | |

## ORDER GRANTING DEFENDANT TRAVIS COUNTY'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Travis County's Motion for Summary Judgment. After careful consideration of the Motion, Plaintiff's response, if any, and the pleadings filed by the parties, the Court is of the opinion that said Motion has merit and should be GRANTED.

Accordingly, it is

ORDERED, ADJUDGED, AND DECREED that Defendant Travis County's Motion for Summary Judgment is hereby GRANTED.

SIGNED this _____ day of _____, 2016.

_____
SAM SPARKS
PRESIDING JUDGE